## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELISSA NIBLETT, | : | Civil No. 1:21-CV-01345 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| EXP REALTY, LLC, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

This case involves allegations of violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Laws ("UTPCPL"), fraud, fraudulent concealment, fraudulent inducement, concert of action, and negligence relating to the purchase of a home.  Plaintiff Melissa Niblett ("Niblett") asserts that Defendants in this case individually, and in concert, concealed the true state of the home she purchased.  Before the court are several motions to dismiss filed by Defendants, as well as Plaintiff's motions for oral argument and to lift the stay of discovery in this case.  (Docs. 17, 18, 29,40, 51, 66, & 67.)

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Niblett alleges that she engaged the services of Defendant eXp Realty ("eXp") and one of its employees, Defendant Colin Cameron ("Cameron"), an employee of eXp, in April of 2019, because she intended to buy a new property.  (Doc. 1, ¶¶ 17, 19.)  Niblett executed a Buyer Agency Contract.  (*Id.* ¶ 19; Doc.

1-2.)  Cameron arranged for Niblett to visit a property located at 149 Maple Drive in Hanover, Pennsylvania, in late April 2019.  (*Id.* ¶¶ 3, 20, 22.)   The home was, at that time, owned by Defendant Jennifer Hommerbocker ("Hommerbocker").  (*Id.* ¶ 21.)  Niblett was interested in purchasing the property, so she requested additional information, after which the Seller's Disclosure was produced.  (*Id.* ¶ 23; Doc. 1-3.)  Niblett and Cameron reviewed the Seller's Disclosure and discussed an appropriate offer, which was ultimately accepted.  (Doc. 1, ¶¶ 23–24.)  Niblett and Hommerbocker then executed an Agreement of Sale on May 1, 2021.  (*Id.* ¶ 25; Doc. 1-4.)  The Agreement of Sale indicated that eXp was acting as a Dual Agent, representing both Niblett and Hommerbocker, and was prohibited from taking any action that is adverse or detrimental to either party but was required to disclose known material defects about the property.[1]  (Doc. 1, ¶¶ 26–27.)

Having executed the Agreement of Sale, Niblett applied for a mortgage with Defendant CrossCountry Mortgage Company, Inc. ("CrossCountry").  (*Id.* ¶ 28.)  CrossCountry then engaged the services of Defendant Rogers Appraisal ("Rogers") to conduct an appraisal of the property.  (*Id.* ¶ 29.)  Rogers conducted an appraisal and generated an Appraisal Report on May 15, 2019.  (*Id.* ¶ 30; Doc. 1-5.)  The

---

[1] The complaint does not identify Defendant Laury O'Neill ("O'Neill") as anyone another than an employee of eXp.  The only factual allegation in the complaint that contains O'Neill's name states that Defendants eXp, Cameron, Nicole Butcher, and O'Neill completed the buy/sell side of four properties listed, sold and/or bought by eXp clients all on the same day.  (Doc. 1, ¶ 49.)  However, the court notes from the Agreement of Sale that O'Neill is listed as Hommerbocker's agent in executing the agreement.  (Doc. 1-4, p. 2.)

Appraisal Report valued the property at $190,000.  (Doc. 1, ¶ 31.)  The report specified that the intended user was GMH Mortgage Services/USDA.  (Doc. 1-5, p. 4.)[2]  Additionally, the report indicates that the appraisal "should not be construed as a home inspection" and that the "report is used by the lender client and HUD for mortgage insurance purposes only," as the appraiser "does not warrant condition, performance or life expectancy of any component."  (*Id.*)

On Cameron's advice, Niblett engaged Defendant Top Dawg Inspections ("TDI") to conduct a home inspection.  (Doc. 1, ¶ 38.)  TDI inspected the property and provided an inspection report on May 18, 2019.  (*Id.* ¶ 39.)  With the mortgage approved, June 7, 2019 was set as the closing date.  (*Id.* ¶ 40.)  Prior to closing, Plaintiff met with Defendant Nicole Butcher ("Butcher"), another employee of eXp, to do a walkthrough of the property.  (*Id.* ¶ 41–42.)  Niblett and Butcher walked through the property and discussed issues with some areas of floor molding, which Butcher explained would simply need reattached, or may require some minor repair.  (*Id.* ¶¶ 42–43.)  Additionally, Niblett asked Butcher about lines and cracks along the basement walls, which Butcher explained were common issues that appear where mortar attaches to the walls.  (*Id.* ¶¶ 44–45.)  After the walkthrough, Niblett asked Cameron about the issues she noticed on the

---

[2] For ease of reference, the court utilizes the page numbers in the CM/ECF header.

walkthrough and was again advised that there were no significant issues.  (*Id.* ¶ 46.)

Niblett closed on the house on June 7, 2019.  (*Id.* ¶ 47.)  She moved into the home immediately after closing.  (*Id.* ¶ 50.)  At an unspecified time after she moved into the home, Niblett noticed that the carpet in the basement was wet and there appeared to be moisture on the basement walls.  (*Id.* ¶ 52.)  Niblett was advised by a neighbor that the first floor living room was sinking.  (*Id.* ¶ 55.)  She then went into the first floor living room, moved an end table, and confirmed that the first floor did appear to tilt.  (*Id.* ¶ 56.)  Niblett then contacted Cameron, who visited the property in early July 2020 and advised that it was a "grading problem." (*Id.* ¶¶ 57–58.)  In August 2020, Niblett contacted a contractor to estimate the cost of repairs.  (*Id.* ¶ 59.)  The contractor advised that the damage did not appear to be recent and was not a minor repair.  (*Id.* ¶ 60.)  Niblett contacted Cameron again, who advised her to get a second opinion.  (*Id.* ¶ 62.)  Cameron also advised that she could commence mediation against Hommerbocker for failing to make the necessary disclosures.  (*Id.* ¶ 61.)

Toward the end of September 2020, water continued to penetrate the home. (*Id.* ¶ 64.)  Niblett contacted Liberty Restorations, who provided an estimate of damages and necessary repairs on October 1, 2020.  (*Id.* ¶ 63; Doc. 1-7.)  Niblett hired C3 Exteriors ("C3") for another estimate as the problem worsened.  (Doc. 1,

¶ 65.)  Niblett discussed the problem with Cameron and C3.  (*Id.* ¶ 66.)  In October 2020, C3 advised that there was a gap between the houses, and that the gap looked like it had been filled with caulk as a temporary fix to cover up the deteriorating condition.  (*Id.* ¶ 67.)  Around the same time, Niblett contacted Smith Brothers, a building contractor to estimate replacement of a door, but Smith Brothers refused to quote the door, citing major structural problems with the building.  (*Id.* ¶¶ 68– 69.)  Smith Brothers suggested that Niblett contact a structural engineer named Jeff Fertich ("Fertich").  (*Id.* ¶ 70.)  Fertich advised Niblett that he had personally been to the property in the 2015-2016 timeframe, and notified Hommerbocker of major structural issues at that time.  (*Id.* ¶ 71.)

Niblett later discovered a contract with Keystone Foundation, signed by the neighbor, for repair to both Niblett's home and the neighbor's home.  (*Id.* ¶ 72; Doc. 1-8.)  Due to the failure to make payments, the quoted repairs were not completed.  (Doc. 1, ¶ 73.)

The most recent estimate to prevent further sinking of the foundation showed a minimum project cost of $128,440.  (*Id.* ¶ 74; Doc. 1-9.)  Fertich and Keystone Foundation advised that the home needed to be pinned or underpinned to prevent collapse.  (Doc. 1, ¶ 75.)  Niblett asserts that the foundation issues are material defects that were known or should have been known to Defendants.  (*Id.* ¶

79.)  Thus, Niblett initiated this action by filing a complaint on August 2, 2021 asserting violations of the UTPCPL and various counts of fraud.  (Doc. 1.)

On September 2, 2021, both Rogers and Hommerbocker filed motions to dismiss.  (Docs. 17, 18.)  Both briefs in support were filed the following day. (Docs. 19, 21.)  Niblett filed briefs in opposition on September 17, 2021 and September 21, 2021, respectively.  (Docs. 31, 34.)  Reply briefs were then filed by Rogers and Hommerbocker, respectively, on September 24, 2021 and September 28, 2021.  (Docs. 37, 39.)

TDI filed a motion to dismiss with an accompanying brief in support on September 13, 2021.  (Docs. 29, 30.)  Niblett filed a brief in opposition on September 28, 2021.  (Doc. 38.)  TDI timely filed a reply brief on October 11, 2021.  (Doc. 44.)

Butcher, Cameron, eXp, and Defendant Laury O'Neill (collectively, "the eXp Defendants") filed a motion to dismiss on October 1, 2021.  (Doc. 40.)  Their brief in support was filed on October 7, 2021.  (Doc. 43.)  Niblett's brief in opposition was filed October 29, 2021.  (Doc. 47.)  The eXp Defendants filed their reply brief on November 8, 2021.

Finally, CrossCountry filed its own motion to dismiss on November 2, 2021. (Doc. 51.)  Its brief in support was filed November 4, 2021.  (Doc. 52.)  Niblett

filed a brief in opposition on December 2, 2021. (Doc. 62.) On December 15, 2021, Crosscountry filed its reply brief. (Doc. 65.)

Following a case management conference on November 29, 2021, the court entered an order staying discovery in this matter pending the resolution of the motions to dismiss. (Doc. 61.) Niblett then filed a motion on January 12, 2022, requesting oral argument on the pending motions, indicating that "while all defendants are content with the court deciding the motion on briefs, none oppose oral argument." (Doc. 66, ¶ 16.) Most recently, Plaintiff filed a motion to lift the stay of discovery.[3] (Doc. 67.)

All of the motions are ripe for review.

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the Plaintiff and Defendants and the amount in controversy exceeds $75,000. Further, venue is appropriate under 28 U.S.C. § 1391.

## STANDARD OF REVIEW

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

---

[3] Because the court is granting dismissal of all of the claims in this case, but permitting leave to amend, the court will defer ruling on this motion until an amended complaint is filed.

on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the

plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (quoting

*Twombly*, 550 U.S. at 556).  "Conclusory allegations of liability are insufficient" to

survive a motion to dismiss.  *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir.

2019) (quoting *Iqbal*, 556 U.S. at 678−79).  To determine whether a complaint

survives a motion to dismiss, a court identifies "the elements a plaintiff must plead

to state a claim for relief," disregards the allegations "that are no more than

conclusions and thus not entitled to the assumption of truth," and determines

whether the remaining factual allegations "plausibly give rise to an entitlement to

relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

   In considering a motion to dismiss, the court generally relies on the

complaint, attached exhibits, and matters of public record.  *Sands v. McCormick*,

502 F.3d 263, 268 (3d Cir. 2007).  The court may also consider "undisputedly

authentic document[s] that a defendant attached as an exhibit to a motion to

dismiss if the plaintiff's claims are based on the [attached] documents." *Pension*

*Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Moreover, "documents whose contents are alleged in the complaint and whose

authenticity no party questions, but which are not physically attached to the

pleading, may be considered." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002); *see also U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 382, 388 (3d Cir. 2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss in one for summary judgment").   However, the court may not rely on other parts of the record in determining a motion to dismiss, or when determining whether a proposed amended complaint is futile because it fails to state a claim upon which relief may be granted. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).

DISCUSSION

At the outset, the court notes that several Defendants have raised defenses that apply to all claims against them.  The court will address these arguments first before turning to the arguments relating to individual claims.

## A. Statutes of Limitations

Several Defendants raised arguments relating to the applicable statutes of limitations for the claims in this case.  Rogers and the eXp Defendants argue that counts two through six[4] are barred by Pennsylvania's two-year statute of

---

[4] The complaint initially contained a claim for unjust enrichment at count seven and a claim for intentional infliction of emotional distress at count eight.  (Doc. 1, ¶¶ 125–133.)  Those counts were withdrawn without prejudice by stipulation of the parties on December 8, 2021.  (Doc. 64.)

limitations for tort claims.  (Doc. 21-1, pp. 6–7; Doc. 43, pp. 19–23.)  In response, Niblett argues that the discovery rule and/or fraudulent concealment[5] doctrines tolled the statute of limitations.  (Doc. 31, pp. 14–15; Doc. 47, pp. 16–18.)

TDI argues that all of Niblett's claims against it are governed by Pennsylvania's Home Inspection Law, which dictates that all actions to recover damages arising from a home inspection report must be commenced within one year after the date the report is delivered.  (Doc. 30, pp. 4–5.)  Here, Niblett argues that TDI has not cited any binding case law demonstrating that the one-year statute of limitations in the Home Inspection Law preempts the six-year statute of limitations set forth in the UTPCPL.  (Doc. 38, pp. 15–17.)  Niblett then contends that in any event, even if the one-year statute of limitations applied to her claims against TDI, it would likewise have been tolled by the discovery rule and/or fraudulent concealment doctrines.  (*Id.*)

It is undisputed that Niblett's complaint was filed more than two years after the latest alleged tortious conduct, which would have occurred on the date of the sale of the property, June 7, 2019.  Thus, based on these facts, absent any tolling,

---

Some of the parties' briefs contain arguments regarding these two counts, as they were filed prior to the stipulation.  The court need not address those arguments since the counts are withdrawn.

[5] Niblett argues in a cursory fashion that in addition to the discovery rule, the fraudulent concealment doctrine applies to toll the statute of limitations for her claims.  It is unclear from the face of the complaint and the exhibits attached thereto what the factual basis for the fraudulent concealment doctrine is and how, if at all, it may apply to all Defendants.

these claims would fall outside of a two-year statute of limitations.  However,

according to the allegations in the complaint, Niblett was not aware of the

structural issues with the property until sometime in 2020.  (Doc. 1, ¶¶ 53–79.)

While it is not clear exactly when Niblett discovered the problem or the extent of

the problem, dismissal at this stage would only be warranted where "the complaint

facially shows noncompliance with the limitations period and the affirmative

defense clearly appears on the face of the pleading."  *Oshiver v. Levin, Fishbein,*

*Sedran & Berman*, 38 F.3d 1380, 1384 n.1 (3d Cir. 1994).  Thus, based upon the

current record, the court cannot conclude that the claims are time-barred at this

stage of the case.

### B.  Release Provision

Hommerbocker and the eXp Defendants assert that the terms of the

Agreement of Sale release them from liability.  (Doc. 19, pp. 8–9; Doc. 43, pp. 13–

18.)  In response to Hommerbocker, Niblett argues that after reviewing the Seller

Disclosure form, "it was left to Hommerbocker's agent, Defendant Cameron to

explain the check mark was merely 'normal on disclosures with wall cracks from

normal settling of homes . . . and normal where the development is located by the

quarry.'"  (Doc. 21, p. 17.)  These facts, supported by an affidavit attached to

Niblett's brief in opposition, were not alleged in the complaint or attached to the

complaint.  Therefore, it is not appropriate to consider them at the motion to dismiss stage.

In response to the eXp Defendants, Niblett cites the exception to the parol evidence rule, which exists where buyers allege fraudulent inducement.  (Doc. 47, p. 8.)  Niblett then asserts that "Defendants were part of the concealment of material defects as agents of Seller Hommerbocker."  (*Id.*)

The Agreement of Sale contains an explicit release provision:

> Buyer releases, quit claims and forever discharges SELLER, ALL BROKERS, their LICENSEES, EMPLOYEES and any OFFICER or PARTNER of any one of them and any other PERSON, FIRM or CORPORATION who may be liable by or through them, from any and all claims, losses or demands, including, but not limited to, personal injury and property damage and all of the consequences thereof, whether known or not, which may arise from the presence of termites or other wood-boring insects, radon, lead-based paint hazards, mold, fungi or indoor air quality, environmental hazards, any defects in the individual on-lot sewage disposal system or deficiencies in the on-sit water service system, or any defects or conditions on the Property. Should Seller be in default under the terms of this Agreement or in violation of the Seller disclosure law or regulation, this release does not deprive Buyer of any right to pursue any remedies that may be available under law or equity.  This release will survive settlement.

(Doc. 1-4, ¶ 28.)

The eXp Defendants also point to the following provision:

REPRESENTATIONS (1-10)

(A) All representations, claims advertising, promotional activities, brochures or plans of any kind made by Seller, Brokers, their licenses, employees, officers or partners are not a part of this Agreement   unless   expressly   incorporated   or   stated   in   this

Agreement.   This Agreement contains the whole agreement between Seller and Buyer, and there are no other terms, obligations, covenants, representation, statements or conditions, oral or otherwise, of any kind whatsoever concerning this sale.   This Agreement will not b altered, amended, changed or modified except in writing executed by the parties.

(B) Unless otherwise stated in this Agreement, **Buyer has inspected the Property** (including fixtures and any personal property specifically listed herein) **before signing this Agreement or has waived the right to do so, and agrees to purchase the Property IN ITS PRESENT CONDITION**, subject to inspection contingencies elected in this Agreement.  Buyer acknowledges that Brokers, their licensees, employees, officers or partners have not made an independent examination or determination of the structural soundness of the Property, the age or condition of the components, environmental conditions, the permitted uses, nor of conditions existing in the locale where the Property is situated; nor have they made a mechanical inspection of any of the systems contained therein.

(Doc. 1-4, ¶ 25.)

Based on the record before the court at this juncture, including the above-quoted language from the parties' agreement, Niblett's claims against Hommerbocker and the eXp Defendants are barred by the express language of the Agreement of Sale, as Niblett has released them from any and all claims except for claims for violation of the Seller disclosure law, which have not been raised. There is simply not a sufficient basis in the complaint for Niblett's cursory argument that there was fraudulent inducement.  Therefore, all claims against Hommerbocker and the eXp Defendants will be dismissed without prejudice.

## C. UTPCPL

The first count of the complaint is a claim for a violation of the UTPCPL against the eXp Defendants, CrossCountry, Rogers, and TDI.  (Doc. 1, pp. 9–12.) As the Supreme Court of Pennsylvania observed in *Weinberg v. Sun Co.*, 777 A.2d 442, 446 (Pa. 2001), "[t]he UTPCPL's underlying foundation is fraud prevention." The statute prohibits all "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  73 Pa. Stat. Ann. § 201-3(a).  The UTPCPL enumerates twenty distinct "unfair methods of competition" and "unfair or deceptive acts or practices," *see id.* § 201-4(i)–(xx), and contains a catchall provision that further prohibits "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  *Id.* § 201-2(4)(xxi).  The UTPCPL provides a private right of action to consumers who purchase goods or services, including real estate, and suffer an ascertainable loss as a direct result of an unlawful act or practice.  *Id.* § 201-9.2(a); *see also Skurnowicz v. Lucci*, 798 A.2d 788, 794 (Pa. Super. Ct. 2002).

The Supreme Court of Pennsylvania has stated clearly that for a plaintiff to prevail under any provision of the UTCPCPL, he or she "must show that [s]he justifiably relied on the defendant's wrongful conduct or representation and that [s]he suffered harm as a result of that reliance.  *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004).

### 1. Rogers

Rogers argues that because it was retained by CrossCountry to perform the appraisal, Niblett was not a purchaser or lessee of goods or serves, as is required to bring a claim under the UTPCPL.  (Doc. 21-1, pp. 7–8.)  Rogers also asserts that the appraisal report clearly identifies the intended user as GMH Mortgage Services/USDA, indicates that the Appraisal Report "should not be construed as a home inspection" and that the "report is used by the lender client and HUD for mortgage insurance purposes only," as the appraiser "does not warrant condition, performance or life expectancy of any component."  (Doc. 21-1, pp. 2–3) (quoting Doc. 1-5, p. 4.)  As a result, Rogers argues that nobody else, including Niblett, was justified in relying on the Appraisal Report.  (Doc. 21-1, p. 3.)

In response, Niblett first argues that she paid for the appraisal and that under the Agreement of Sale, she most certainly had the exclusive right to rely on the appraisal and cancel the contract.  (Doc. 31, p. 5.)  However, Niblett's assertion that she paid for the appraisal is belied by the allegation in her complaint that "Defendant Crosscountry engaged in the services of Defendant Rodgers [sic] appraisal."  (Doc. 1, ¶ 29.)  Although Niblett attaches as an exhibit to her brief in opposition an itemized estimate of her real estate transaction which appears to show that an appraisal fee was included in her closing costs, based on the complaint and the exhibits attached thereto, namely the Appraisal report, Niblett

was not Rogers' client. Therefore, she was not a purchaser or lessee of any goods or services from Rogers, and the UTPCPL claim against Rogers will be dismissed without prejudice.

## 2. TDI

In its motion to dismiss, TDI asserts that the complaint fails to state a claim upon which relief can be granted under the UTPCPL because the Home Inspection Law explicitly incorporates the UTPCPL and provides four specific prohibited acts, none of which are alleged in the complaint. (Doc. 30, pp. 78.) Niblett provided no specific argument in response. (*See* Doc. 38.)

Section 7505 of the Home Inspection Law is titled "Consumer Remedies" and explicitly incorporates the UTPCPL, providing the following prohibited acts:

> (b) Prohibited acts.—Any of the following acts engaged in by a home inspector, an employer of a home inspector or another business or person that controls or has a financial interest in the employer of a home inspector shall be deemed to be an unfair or deceptive act or practice as defined by section 2(4)(i) through (xxi) of the Unfair Trade Practices and Consumer Protection Law:
>
> > (1) Performing or offering to perform for an additional fee any repairs to a structure with respect to which the home inspector, the employer of the home inspector or such other business or person has prepared a home inspection report within the preceding 12 months, except that this paragraph shall not apply to remediation for radon or wood destroying insects.
> >
> > (2) Inspecting for a fee any property in which the home inspector, the employer of the home inspector or such other business or person has any financial interest or any interest in the transfer of the property, including without limitation receipt of a

commission as an agent, unless the financial interest or interest in the transfer of the property is disclosed in writing to the buyer before the home inspection is performed and the buyer signs an acknowledgement of receipt of the disclosure.

(3) Offering or delivering any commission, referral fee or kickback to the seller of the inspected property or to an agent for either or both of the seller and the buyer for the referral of any business to the home inspector, the employer of the home inspector or such other business or person.

(4) Accepting an engagement to perform a home inspection or to prepare a home inspection report in which the employment itself or the fee payable for the inspection is contingent upon the conclusions in the report, pre-established or prescribed findings or the closing of the transaction.

68 Pa.C.S. § 7505.

The court notes that the Home Inspection Law was enacted on December 20, 2001, which was after the 1976 reenactment of the UTPCPL. In enacting the Home Inspection Law and incorporating the UTPCPL, the legislature could have, but did not, included language indicating that the aforementioned prohibited acts were in addition to any other acts that may be violations of the UTPCPL. Thus, the Home Inspection Law limits the UTPCPL's application to home inspections that implicate the specific prohibited acts.

TDI supports its argument on this score with a non-precedential Superior Court opinion. *See Levy v. Johnson*, 145 A.3d 776 (Pa. Super. Ct. 2016). The court acknowledges that this is a non-precedential opinion, but further research has revealed no other decision directly addressing the overlap between these two

statutory schemes.  Furthermore, Niblett has not provided any argument or cited any case law to the contrary.  Therefore, the court is persuaded by the Superior Court's holding in *Levy*, and finds that claims under the UTPCPL against a home inspector are subject to the provisions of the Home Inspection Law, and must fall under one of the four enumerated prohibited acts.  Because a review of the complaint and the exhibits attached thereto reveals that Plaintiff has not alleged facts sufficient to state a plausible claim under one of the four enumerated prohibited acts, this claim will be dismissed without prejudice.

### 3.  CrossCountry

CrossCountry argues that the UTPCPL claim against it should be dismissed because it is simply a reiteration of Niblett's fraud claims, which it argues were not plead with particularity.  (Doc. 52, p. 9.)  In so arguing, CrossCountry notes that allegations of its specific conduct are limited to three paragraphs in the complaint:

> 28. With the Agreement of Sale executed, Plaintiff applied for a mortgage with Defendant Crosscountry.
>
> 29. Defendant Crosscountry engaged the services of Rodgers [sic] Appraisal.
>
> 34. Crosscountry necessarily considered the Appraisal Report, along with all other aspects of the mortgage application, and approved the mortgage based in large part on the Appraisal Report and Plaintiff's creditworthiness.

(Doc. 1, ¶¶ 28, 29, 34.)  Indeed, a review of the complaint reveals that CrossCountry is not specified in any other factual allegation in the complaint.

Niblett argues in opposition that claims under the catch-all provision of the UTCPCL are now subject to strict liability according to the Pennsylvania Supreme Court.  (Doc. 62, p. 16) (citing *Gregg v. Ameriprise*, 245 A.3d 637, 640 (Pa. 2021)).  She then contends that "[b]ut-for [CrossCountry] approving that mortgage, based on an obviously over-priced market value, which no other appraiser or mortgage company would accept in possession of the same information [CrossCountry] and Rogers Appraisal possessed, Plaintiff would not have been damaged."  (Doc. 62, p. 17.)  However, it is irrefutable that the allegations in the complaint fail to state a claim under the catch-all provision of the UTPCPL, as the complaint does nothing more than allege that CrossCountry engaged the services of Rogers, considered the Appraisal Report, and Plaintiff's creditworthiness, and approved Niblett's mortgage application.  Niblett has failed to allege sufficient factual allegations to the survive the instant motion to dismiss.

### D. Fraud (Counts 2–5)

Next in the complaint are the fraud counts:  fraud, fraudulent concealment, fraudulent inducement, and a concert of action claim premised on underlying fraud.  (Doc. 1, pp. 12–15.)  It is well established that:

> [A]llegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with specificity.  In order to satisfy Rule 9(b), plaintiffs must plead with particularity "the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of

> immoral and fraudulent behavior."   Plaintiffs may satisfy this
> requirement by pleading the "date, place or time" of the fraud, or
> through "alternative means of injecting precision and some measure of
> substantiation into their allegations of fraud."   *Plaintiffs also must
> allege who made a representation to whom and the general content of
> the misrepresentation.*

*Lum v. Bank of America*, 361 F.3d 217, 223–24 (3d Cir. 2004) (internal

citations omitted, emphasis added).  Thus, "[p]ursuant to Rule 9(b), a

plaintiff averring a claim in fraud must specific the who, what, when, where,

and how: the first paragraph of any newspaper story."  *In re Advanta Corp.*

*Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999).

In their respective motions to dismiss, all Defendants argued that the

complaint fails to satisfy the Rule 9(b) standard.  (Doc. 19, p. 11; Doc. 21-1, pp. 8–

9; Doc. 30, pp. 8–9; Doc. 43, pp. 26–27; Doc. 52, pp. 5–7.)  The court agrees.  A

fraud claim requires a plaintiff to provide six elements: (1) a representation; (2)

which is material to the transaction at hand; (3) made falsely, with knowledge of its

falsity or recklessness as to whether it is true or false; (4) with the intent of

misleading another into relying on it; (5) justifiable reliance; and (6) an injury

proximately caused by the reliance.  *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994).

Additionally, Pennsylvania courts have recognized that in real estate

transactions, "fraud arises when a seller knowingly makes a misrepresentation,

undertakes a concealment calculated to deceive, or commits non-privileged failure

20

to disclose." *Youndt v. First. Nat. Bank of Port Allegany*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005).  Lastly, where the plaintiff alleges the defendant made fraudulent representations to induce the plaintiff into entering into the contract, Pennsylvania recognizes fraud in the inducement.  *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 204 (Pa. 2007).

Here, although each count of the complaint incorporates by reference the prior paragraphs in the complaint, the complaint does not contain sufficient allegations to allege any of these forms of fraud.  The complaint does not plead with particularity how Defendants made representations with knowledge of their falsity, how Defendants made representations with the intent to mislead, and how Niblett relied on each alleged misrepresentation.

As to Rogers and CrossCountry, the complaint fails to plead any representations made from Defendants to Niblett at all.   As to TDI, the complaint fails to plead how TDI made the misrepresentations with the intent to mislead. Therefore, Niblett has failed to plead the fraud claims with specificity and Defendants' motions to dismiss the fraud claims will be granted without prejudice.

**E. Negligence**

Count six of the complaint is a negligence claim against all Defendants. After incorporating by reference the prior 122 paragraphs, the negligence count alleges the following:

123.   Each of the Defendants owed a duty to Plaintiff which was breached, causing her actual and proximate damages.

124.   The acts specified in these incorporated pleadings demonstrates a failure to abide by the duty owed to Plaintiff by the Defendants caused damages and injuries to Plaintiff that were willful, wanton and reckless.

(Doc. 1, p. 16.)

Examining all of the factual allegations in the complaint, Niblett has failed to specify the duties owed to her by each of the defendants and what acts breached those duties.  In fact, the word "duty" does not appear in the complaint at all before paragraph 123.  Therefore, the negligence claim fails as pleaded.

Additionally, some Defendants have argued that the economic loss and gist of the action doctrines bar this claim because it is a claim for economic damages that flows from a contract.  (Doc. 30, pp. 10–11; Doc. 43, pp. 30–31.)  "The general rule of law is that economic losses may not be recovered in tort (negligence) absent physical injury or property damage."  *Spivack v. Berks Ridge Corp.*, 586 A.2d 402, 405 (Pa. Super. Ct. 1990).  The record must demonstrate either personal injury to the plaintiff or property damage resulting from the defendant's actions or lack thereof.  *Id.* (affirming lower court's decision to dismiss the negligence cause of action under the economic loss doctrine because the record offered no indication of either personal injury to the appellants or property damages to their condominium resulting from the builder/contractor's actions or lack thereof).

Accepting the allegations in the complaint as true, the property damage at issue in this case pre-existed Niblett's purchase of the property. Thus, property damage did not result from any of the defendants' actions or lack thereof. Because the negligence claim fails as pleaded and is barred by the economic loss doctrine, it will be dismissed with prejudice.

### F.  Respondeat Superior/Vicarious Liability

Count nine of the complaint is respondeat superior/vicarious liability, in which Niblett asserts that eXp is liable for the torts of Cameron, Butcher, and O'Neill, that Rogers is liable for the torts of its inspector, that CrossCountry is liable for the torts of Rogers, and that TDI is liable of the torts of its inspector.

Several Defendants implicated in this claim have argued that respondeat superior is not a standalone claim, but rather is a theory of liability. (Doc. 21-1, p. 13; Doc. 30, p. 13; Doc. 43, pp. 34–35.)  Indeed, the language in the complaint seems to concede this point: "[a]s the relationships alleged in this section, the principals and employers identified must answer for the torts of their agents and employees under the *theory* of Respondeat Superior and vicarious liability." (Doc. 1, p. 18) (emphasis added).  Niblett responded to the substantive arguments relating to whether Rogers was an agent of CrossCountry, but did not otherwise respond to the arguments regarding the viability of respondeat superior/vicarious liabililty as a standalone claim.

Courts have explained that there is no independent cause of action for

respondeat superior under Pennsylvania law.  *Khawaja v. Bay Mgmt. Grp., LLC*,

No. 22-CV-182, 2022 U.S. Dist. LEXIS 78810, at *8 (E.D. Pa. May 2, 2022).  *See*

*also Hena v. Target Corp.*, No. 20-CV-3060, 220 U.S. Dist. LEXIS 200294, at *12

(E.D. Pa. Oct. 28, 2020) ("Respondeat superior merely connotes a doctrine of

imputation once an underlying theory of liability has been established.  It is not a

separate cause of action"); *Olschefski v. Red Lion Area Sch. Dist.*, No. 12-CV-871,

2012 U.S. Dist. LEXIS 170693, at *21–22 (M.D. Pa. Nov. 30, 2012) ("In

Pennsylvania, there is no separate cause of action for respondeat superior

liability"); *Shuster v. McDonnell Douglas Corp.*, No. 87-CV-3932, 1988 U.S. Dist.

LEXIS 3595, at *8 (E.D. Pa. Apr. 20, 1988) ("'*Respondeat superior*' is not a basis

for a separate count").  Because there can be no standalone claim for respondeat

superior, this count will be dismissed with prejudice.

Additionally, the court notes that all of the underlying tort claims against the

defendants will be dismissed with leave to amend.  Thus, if Niblett files an

amended complaint, she is permitted to pursue a *theory* of respondeat superior

liability.

### G. Punitive Damages

Finally, the court will address Defendants' motion to dismiss the claim for

punitive damages, which appears in count ten of the complaint.  Because all of the

underlying substantive claims will be dismissed, the punitive damages claim will likewise be dismissed, but without prejudice.

### CONCLUSION

For the foregoing reasons, the court will grant Defendants' motions to dismiss.  (Docs. 17, 18, 29, 40, 51.)  The court will deny as moot Plaintiff's motion for oral argument.  (Doc. 66.)   An appropriate order follows.

<u>s/Jennifer P. Wilson</u>
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: September 19, 2022